**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

PEGGIE L. MATHENIA

        Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

No. C05-02039

**ORDER**

_____

This matter comes before the court pursuant to briefs on the merits of this application for disability insurance benefits. On January 19, 2006, the parties have consented this matter to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (docket number 17). The final decision of the Commissioner of Social Security is affirmed and this matter is dismissed.

## I. PROCEDURAL BACKGROUND

Plaintiff Peggie Mathenia applied for Disability Insurance Benefits and Supplemental Security Income benefits on January 8, 2002, alleging an inability to work since February 20, 1998 (Tr. 703-05). Ms. Mathenia's application was originally denied (Tr. 694-96), and denied again on reconsideration (Tr. 699-701). A hearing before Administrative Law Judge (ALJ) Andrew T. Palestini was held on October 4, 2004 (Tr. 1054-1113). The ALJ denied Ms. Mathenia's appeal in a decision dated December 16, 2004 (Tr. 21-44). The Appeals Council denied Ms. Mathenia's request for review on March 21, 2005 (Tr. 13-15). This action for judicial review was filed on April 5, 2005.

## II.  FACTUAL BACKGROUND

Ms. Mathenia allegedly became disabled in 1998 due to back pain, arthritis, and anxiety (Tr. 180).  Ms. Mathenia's initial claim filed in September of that year proceeded through the proper administrative channels and was denied on February 23, 2001 by ALJ John P. Johnson (Tr. 671-80).  The Appeals Council denied Ms. Mathenia's request for review of that initial claim on April 22, 2002 (Tr. 690-93).  Because Ms. Mathenia's new 2002 application for benefits presents the same issues, facts, and parties as the prior completed claim and Ms. Mathenia failed to pursue further appeal of the initial claim, res judicata principles now limit the examination period of relevant medical evidence (Tr. 21).  The relevant period begins on February 24, 2001, the day after the prior unfavorable ALJ decision, and ends on December 31, 2003, the date Ms. Mathenia was last insured for disability benefits (Tr. 21-22).

### A.  Relevant Medical History

On April 6, 2001, Ms. Mathenia visited the Covenant Medical Center Clinic for back pain and arthritis, claiming that "every joint in her body is in pain, especially bilateral hips." (Tr. 943).   Upon physical examination, Dr. Harter noted that Ms. Mathenia had decreased flexion, extension, twisting, and turning in addition to tenderness in the coccyx and sacral areas (Tr. 943).  She was sent home with Vicodin for the pain and instructed to see Dr. Claro Palma, a rheumatologist (Tr. 943).

Ms. Mathenia again visited Dr. Harter at the Covenant Clinic for back pain and discomfort on August 15, 2001 (Tr. 935).  Dr. Harter noted tenderness in the right lumbar musculature and around the right hip which causes significant pain when moved (Tr. 935).  She claimed that the Darvocet pain pills she had been taking were not effective and requested stronger medication (Tr. 935).  Dr. Harter prescribed Lortab and suggested that Ms. Mathenia keep her upcoming appointment with Dr. Palma (Tr. 935).

On September 11, 2001, Ms. Mathenia underwent a radiological test on her spine at Allen Memorial Hospital due to a history of low back pain (Tr. 934).  Despite mild

degenerative facet changes, the results were unremarkable and offered "no evidence for an intervertebral disc herneation or spinal stenosis." (Tr. 934).

On October 26, 2001, Ms. Mathenia, then forty-three years old, was seen for outpatient physical therapy at the Waverly Municipal Hospital due to a history of recurrent lumbar pain and intermittent migraine headaches (Tr. 814). She claimed that the past year proved particularly stressful given the death of her two grandchildren but that she was "doing quite well . . . working with a psychologist." (Tr. 814). Physical therapist Jody Reyerson reported that Ms. Mathenia demonstrated a very limited range of motion due to pain, but improved mobility as well as decreased tenderness with treatment (Tr. 814). Ms. Reyerson suggested a full home exercise program in addition to weekly physical therapy visits (Tr. 814).

In November of 2001, Ms. Mathenia visited the Covenant Clinic as a walk-in patient for a continuous productive cough and was diagnosed with sinusitis and bronchitis (Tr. 927-28). The respiratory pattern displayed on exam did not confirm asthma. Ms. Mathenia was "again reminded to quit smoking altogether" and to follow-up with her primary care physician Dr. Harter the next month (Tr. 927).

On March 26, 2002, Ms. Mathenia saw Dr. Randall Bremner on a referral from Dr. Harter at the Covenant Clinic due to dysfunctional uterine bleeding and pelvic cramps (Tr. 922-23). Dr. Bremner reported that she "has difficulty providing correct data history and is rather evasive with me and gives contradictory answers during the interview." (Tr. 922). Dr. Bremner diagnosed Ms. Mathenia with menometrorrhagia and performed an endometrial biopsy that suggested exogenous hormone effect, but showed no atypical hyperplasia or malignancy (Tr. 923-24).

On April 14, 2002, Ms. Mathenia was admitted to Allen Memorial Hospital with an acute myocardial infarction after experiencing shoulder pain (Tr. 846-55). She underwent emergency angioplasty that "showed complete occlusion of the right coronary artery and some distal disease of her circumflex coronary artery." (Tr. 846). Two stents

were successfully positioned in the affected coronary artery and after two days in intensive care, Ms. Mathenia was discharged on April 17, 2002 and "urged to quit smoking." (Tr. 846).

In May and again in June, Ms. Mathenia visited Dr. Harter about fatigue, lethargy, left leg numbness, and falling spells in the wake of the heart surgery (Tr. 914-19). On June 21, 2002, Dr. Harter confirmed that a facial x-ray showed no fracture pursuant to Ms. Mathenia's recent fall on her right cheek (Tr. 914). In light of these falling episodes, Dr. Harter conferred with her other physicians and agreed to adjust medications accordingly (Tr. 914).

In a letter to primary care physician Dr. Harter on May 13, 2002, Dr. Claro Palma described Ms. Mathenia's medical diagnoses as follows: "fibromyalgia with variable intermittent flare-up of symptoms; degenerative arthritis of the cervical and lumbar spine with persistent back pain; osteoarthritis of the peripheral joints; trochanteric bursitis of the hips; and recent acute MI." (Tr. 1007). In addition to follow-up treatment, Dr. Palma recommended that Ms. Mathenia continue taking zoloft, celebrex, flexeril, as well as oxycodone for pain, and alternate ice/heat every 4-6 hours as needed (Tr. 1007). Ms. Mathenia had an established history of follow-up care for these physical issues with Dr. Palma since her first visit as a referral from Dr. Harter on May 9, 2001 (Tr. 1016-21;1023-35).

Ms. Mathenia returned to the Allen Memorial Hospital Emergency Room multiple times in the months following heart surgery complaining of chest pains, but did not suffer a second MI (Tr. 876-80). On May 28, 2002, she underwent a Persantine stress myocardial scan that showed no evidence of scarring or ischemia and was discharged that same day (Tr. 876). On June 6, 2002, she was given additional beta blockers, an EKG, and underwent overnight observation (Tr. 879, 1005). ER Dr. Koo determined that Ms. Mathenia's condition posed no imminent danger, that she remained hemodynamically stable, and reported that both enzymes and EKG's were negative (Tr. 879, 1005).

Dr. David Kabel, a Cedar Valley Medical Specialist, completed a cardiology progress note on June 20, 2002 after a follow-up visit with Ms. Mathenia who complained of intermittent chest pains, light-headedness, and falling down spells (Tr. 1005). Dr. Kabel conducted an unremarkable physical exam, scheduled a future lipid profile, made minor adjustments to her Lipitor medication, and requested to see Ms. Mathenia again six weeks later (Tr. 1005).

On August 20, 2002, Ms. Mathenia was taken by wheelchair from Dr. Harter's office to the Covenant Medical Center ER complaining of weakness, fatigue, and having fainted (Tr. 905). The first nurse on the scene reported that Ms. Mathenia "acted like she was asleep and was failing the hand drop test." (Tr. 905). She appeared alert and talkative on the way toward and while checking into the ER (Tr. 908). Upon physical examination, she could "walk on her heels and toes" and get up from a chair with out any assistance or using her arms (Tr. 905). Laboratory reports were "entirely normal" and she was released as "medically stable" without any change in medication (Tr. 906).

On September 30, 2002, Ms. Mathenia was taken by ambulance to the ER after chest pains, nausea and vomiting while attempting to do light housework (Tr. 957, 959, 962). Upon arriving to the ER, she was "chest pain free" and during an unremarkable physical examination remained "awake, alert, and oriented." (Tr. 957). The EKG, chest x-ray and laboratory work performed were all normal (Tr. 958). Ms. Mathenia was monitored overnight and scheduled for follow-up catheterization upon release (Tr. 961). It remained unclear if the pain was reflux- or cardiac-related at that time (Tr. 963).

On July 18, 2002, Ms. Mathenia visited Covenant Clinic as a walk-in patient complaining of right hip pain after bumping into her computer table at home (Tr. 912). The resultant physical and radiological examinations that Dr. Bryan Mutchler performed were unremarkable, showing no arthritic changes (Tr. 913). Ms. Mathenia requested Percocet, claiming that her hip contusion caused severe pain (Tr. 912-13). Dr. Mutchler

suggested an over-the-counter remedy like Advil and that Ms. Mathenia get all prescription narcotic pain medications directly from Dr. Palma in the future (Tr. 912).

On September 4, 2002, Dr. David Kabel conducted a complete physical exam of Ms. Mathenia who complained of extreme drowsiness, fatigue, sleepiness, and lightheaded spells (Tr. 999). She claimed that she "falls asleep easily, sometimes while driving" and will sleep on and off throughout day (Tr. 999). The cardiac examination revealed no signs of peripheral edema (Tr. 999). Dr. Kabel stated that her several medications may induce drowsiness, but ordered a sleep study to determine if there was an apnea component involved (Tr. 999). Evidence of this sleep study is not provided in the record.

On September 13, 2002, the claimant's husband Paul Mathenia completed a Third Party Daily Activities Questionnaire regarding his wife's activities (Tr. 756-58). He claimed that Ms. Mathenia could not bathe, dress, shave, or fix her hair most of the time without assistance (Tr. 756). Mr. Mathenia stated that she sleeps between 12 and 16 hours daily, is constantly fatigued, and cannot perform normal household chores (i.e., dishes, laundry, vacuuming, etc.) that require lifting (Tr. 756). He claimed that Ms. Mathenia rarely shops on her own and must be reminded of and taken to the vast majority of appointments (Tr. 757). He admitted that Ms. Mathenia does possess a valid driver's license, but seldom drives because she fears falling asleep at any moment (Tr. 757). Allegedly, her leisure activities (playing cards, watching television, and using the internet) are limited to the time she can comfortably sit in a chair (Tr. 757). Mr. Mathenia noted that his wife "visits with friends and relatives on an almost daily basis." (Tr. 757). He further claimed that crowds tend to agitate Ms. Mathenia, particularly the sight of infants which "can cause extreme mental anguish." (Tr. 758). Mr. Mathenia described that his wife can complete tasks that do not involve lifting or protracted periods of sitting/standing, such as paying bills (Tr. 758).

On December 23, 2002, the comprehensive EMG exam and nerve conduction studies were performed on Ms. Mathenia's upper extremities revealed unremarkable

results (Tr. 996-98). Dr. Bekavac concluded that "there is no EMG evidence for cervical motor radiculopathy, polyneuropathy, or myopathy." (Tr. 996).

In January of 2003, Ms. Mathenia was referred by Dr. Palma for follow-up care with specialist physician Dr. Ivo Bekavac at the Cedar Valley Medical Clinic pursuant to earlier MRI results of the cervical spine that appeared abnormal (Tr. 987-95). A new MRI of the thoracic spine was performed on January 13, 2002 which demonstrated "a lesion in the cervical chord suggestive of MS," but there was "no evidence of MS" identifiable at that time (Tr. 993). A spinal tap was also performed and demyelinating plaque thought to be the cause of chord abnormalities (Tr. 989). Prednisone tapers and repeat tests were ordered (Tr. 989).

On February 5, 2003, Dr. Torage Shivapour, a neurologist with the University of Iowa Hospitals and Clinics, determined that past radiological tests and clinical history suggest multiple sclerosis, but only "one area of focal sclerosis" is evident from the recent MRI which might instead "represent transverse myelitis." (Tr. 1042-44). Dr. Shivapour suggested a follow-up MRI after three months (Tr. 1043).

### B. Plaintiff's Subjective Complaints

On January 24, 2002, Ms. Mathenia completed a personal pain/fatigue questionnaire with the help of her attorney, Mr. Hugh Field (Tr. 746-51). She claims that her physical pain is present daily, sometimes in the back, shoulder, and head, and other times concentrated in her hip and knees (Tr. 747). Frequent cortizone shots and pain killers temporarily relieve the pain for a few hours (Tr. 747). Standing stationary, walking, cold weather and high humidity worsen her pain (Tr. 747). She also claims to suffer severe anxiety and panic attacks brought on when around children or in crowded public venues (Tr. 747). When in public, she is prone to hear voices that call her "baby killer" or "murderer" and cannot complete simple tasks like grocery shopping on her own (Tr. 747). She describes her pain in the back, hands, left shoulder, hip and knee as constant and claims that she must apply hot/cold packs every two hours and take pain/anti-

inflammatory medications throughout the day (Tr. 747). She applies theragesic three times daily and requires assistance to get in and out of the bathtub (Tr. 748). Ms. Mathenia takes Percocet, Darvacet, and Hydrocodone for pain, which she claims help, but are not curative (Tr. 749, 747). She takes several other medications for both her physical and mental symptoms (Tr. 749).

Ms. Mathenia claims that the many prescriptions make her fatigued, repetitive, and forgetful throughout the day and contribute to sleeplessness at night for which she must take additional pills (Tr. 748, 750). As a result of her pain and fatigue, Ms. Mathenia claims that she is restricted in activities involving children, housework, and lifting items that weigh over five pounds (Tr. 748). Since the symptoms began, she has gained ninety pounds (Tr. 748). She states that she can only write for short periods of time, cannot put on her own shoes/socks without aid, requires a tool to retrieve items on the floor, and sometimes requires assistance to get in and out of chairs (Tr. 750). Her children help to prepare meals, clean up, and load the dishwasher (Tr. 750). She claims she cannot sit for over one half hour without needing an ice/heat pack and reports severe pain whenever sitting, standing or walking for "other than brief periods." (Tr. 751).

On February 6, 2002, Ms. Mathenia also completed a daily activities questionnaire wherein she states that she bathes, showers, and dresses with help or reminders and rarely shaves (Tr. 743-46). She explains her need to use a bathtub railing even when assistance is provided (Tr. 743). She states that she rarely does the dishes or any ironing (Tr. 743). Ms. Mathenia prepares daily meals under supervision and occasionally shops but only with help (Tr. 744). Friends or family usually drive her around, but once or twice a week Ms. Mathenia will drive herself even though on pain medications (Tr. 744). She needs reminders at times to take all of her prescribed medications and claims that the pain killers cause stomach problems (Tr. 744). She claims to take care of her grandchild sometimes when help is available (Tr. 744).

With regard to social functioning, Ms. Mathenia avoids going out in public and usually invites others over to visit "because of the stairs." (Tr. 745). In an undated Claimant's Statement prior to the disability hearing, Ms. Mathenia reported that she has "no activities or social functioning" and described that "the only place that I am safe is in my room." (Tr. 766). She claims that public venues bring on panic attacks as she hears voices and becomes traumatized at the sight of children (Tr. 745). Ms. Mathenia claims to participate in a monthly SIDS support group (Tr. 745). She further asserts that the medications negatively impact her concentration and remembering skills such that she forgets "where the kids went" or will "start supper over again" even after finished eating (Tr. 746). Ms. Mathenia claims that she sometimes has trouble following directions because she gets easily side-tracked (Tr. 746). Ms. Mathenia affirms that she can pay bills and manage money (Tr. 746).

On September 15, 2002, Ms. Mathenia completed another personal pain/fatigue questionnaire wherein she stated that she suffers from constant fatigue and pain in her back, hip, and knees, as well as occasional migraines and pain in her shoulder, elbows, and fingers (Tr. 763-65). Since heart surgery on April 14, 2002, she claims to be on increased medications (Tr. 765) and frequently experiences shortness of breath (Tr. 763). She claims to spend most of the day, between fourteen and sixteen hours, sleeping or severely fatigued due to the medications and reports having energy for only "a couple of hours during the afternoon." (Tr. 763). She asserts that on days of physician's appointments, she cannot take her medications or will miss the appointment due to fatigue (Tr. 763). She claims that her children now prepare dinner and wake her when the meal is ready (Tr. 764). Ms. Mathenia further contends that the medications make her feel as though she is "in a fog" that make her disoriented and easily confused (Tr. 763). She claims to undergo cortizone shots every three months, rotate hot/cold packs every two hours, and regularly attend physical therapy (Tr. 763). She claims that her chronic fear of babies persists and that she hates to appear in public where a baby may surface because

it causes her acute mental distress (Tr. 763). Ms. Mathenia also claims to no longer be able to use the stairs (Tr. 763).

## C. Competing RFCs

According to a January 14, 2002, letter from primary care physician Dr. Harter regarding Ms. Mathenia's disability determination, Ms. Mathenia had a confirmed history of depression as well as arthritis (Tr. 835). Dr. Harter could not opine as to the applicability of other illnesses complained of such as a torn rotator cuff, claustrophobia, hearing voices, anxiety, or post traumatic stress disorder, however (Tr. 835). Dr. Harter determined that Ms. Mathenia's arthritic condition would prevent her from lifting or carrying items greater than 5-10 pounds, standing or walking for long periods of time, or stooping, kneeling, crawling, and climbing (Tr. 835). He further asserted that Ms. Mathenia should be able to tolerate sitting and generally handling work environment dust, fumes, temperature, and hazards (Tr. 835).

On March 19, 2002, Dr. Ralph Scott conducted a psycho-diagnostic evaluation for the DSS to which Ms. Mathenia arrived on time, without aid, and displayed "no overt evidence of clinically significant anxiety, mania or OCD." (Tr. 836-39). Dr. Scott's report dated March 22, 2002, listed these diagnostic impressions among others: (1) generalized anxiety disorder with dysphoric panic features; (2) personality disorder with dependent, paranoid an schizotypal features; (3) migraine headaches, insomnia, reflux, arthritis, back pain; and (4) unresolved bereavement issues (Tr. 839). Dr. Scott gave Ms. Mathenia a GAF of 53 and remarked that

> Peggy is emotionally vulnerable, and ongoing psychotherapy is highly recommended. This examiner cannot assess the impact of Peggy's various medical concerns on her vocational prospects. However from a psychological perspective, Peggy is capable of performing at least part-time competitive low skill duties. Estimates of mental options for work-related activities, which appear enhanced through psychotherapy, are: Remember and understand instructions, procedures and locations, fair. Carry out instructions, maintain attention,

> concentration and pace, poor to fair; Interact appropriately
> with supervisors, coworkers and the public, fair; Use good
> judgment and respond appropriately to changes in the
> workplace, fair if provided structured and supportive
> supervision. Peggy is able to handle cash benefits.

(Tr. 839).

On April 11, 2002, state consulting physician Dr. Matthew Kettman completed an RFC assessment for Ms. Mathenia and filed a report of his findings (Tr. 840-45). During the exam, Ms. Mathenia complained of pain and weakness in the left shoulder, arm, and back that allegedly prevent her from carrying out childcare duties (Tr. 840). Dr. Kettman noted that Ms. Mathenia cannot lift in excess of 5 or 10 pounds, walk more than one block, sit for more than two hours at a time, stoop, climb, kneel, travel without sedatives due to anxiety, or work in a dusty environment that aggravates her seasonal allergies (Tr. 842). Still, Dr. Kettman concluded she has no difficulties seeing, hearing, speaking, or handling objects under five pounds (Tr. 842).

On May 23, 2002, after reviewing Dr. Scott's prior evaluation notes, state consulting psychologist Dr. Beverly Westra reported that Ms. Mathenia suffers from mental impairments that moderately restrict her social and cognitive functioning (Tr. 860-61). Dr. Westra reported that Ms. Mathenia's main anxiety and depression symptoms stem from the death of her two infant grandchildren and cause Ms. Mathenia to avoid crowded public places where children might be around (Tr. 860). Lacking concentration and with a variable attention span, Dr. Westra concluded that Ms. Mathenia would find it difficult to complete complex tasks. "Despite this, she is able to cooperate and interact appropriately in one-on-one situations. She is capable of interacting effectively in [an] environment with limited social demands." (Tr. 861).

On July 8, 2002, consulting physician Dr. Claude H. Koons reviewed the medical record and offered an RFC assessment (Tr. 881-890). Dr. Koons reported that Ms. Mathenia should stand at least two hours and sit for approximately six hours in an eight-hour work day, not lift more than ten pounds on occasion, and limit the range of

motion in the left shoulder (Tr. 882, 884). In addition, Dr. Koons indicated that she should only climb, balance, stoop, kneel, crouch or crawl on occasion (Tr. 883). Dr. Koons finds that Ms. Mathenia does suffer from fibromyalgia and osteoarthritis as diagnosed by Dr. Palma, but claims that the record fails to confirm her claim of rheumatoid arthritis or a torn rotator cuff (Tr. 890).

In a single-sentence letter dated July 12, 2002, treating psychiatrist Dr. Matthew Targoff stated that Ms. Mathenia was "unable to work" at that time due to continued treatment since 2001 for emotional problems (Tr. 891).

In a letter dated July 18, 2002, treating physician Dr. Claro Palma noted that Ms. Mathenia suffers from "fibromyalgia, degenerative spine arthritis of the cervical and lumbar spine with persistent back pain, osteoarthritis of the peripheral joints, and trochanteric bursitis of the hips." (Tr. 1001). Dr. Palma further indicated at that time that she was unable to work as result of such medical conditions and "should be considered for food stamps." (Tr. 1001).

On November 14, 2002, consulting psychologist Dr. Herbert Notch reviewed the mental health records and determined that Ms. Mathenia presents "no significant problems with memory, concentration and pace, interaction with supervisors, co-workers and the public, judgment and ability to handle changes at work-like activities." (Tr. 986).

On July 7, 2004, prior to the ALJ hearing, Ms. Mathenia's treating psychiatrist, Dr. Targoff, completed a series of Mental Impairment Interrogatories (Tr. 1049-53). At that time, he noted that Ms. Mathenia seemed to exhibit evidence of all but three of thirty-two signs and symptoms provided, ranging from poor memory to generalized persistent anxiety (Tr. 1049). Dr. Targoff noted her split personality as an additional symptom (Tr. 1049). Dr. Targoff then gave Ms. Mathenia a GAF score of 40 and reported that her highest score that past year was 45, which marked a severe problem (Tr. 1049). Ms. Mathenia was then taking several prescription medications for both her mental and physical conditions, including but not limited to the following: Prevacid, Celebrex,

Flexeril, Detrol, Lisinopril, Seroquel, Inderal, Zoloft, Xanax, Ambien, and Albuterol (Tr. 778, 1050). Dr. Targoff indicated that such medicines may cause impairing side effects such as "fatigue, lack of energy, lethargy, drowsiness, lack of concentration" and forgetfulness (Tr. 1050). Dr. targoff further noted that Ms. Mathenia's impairments would likely cause her to be absent from work more than three times a month and largely described her mental abilities to work as poor or none (Tr. 1051-53).

### D. Hearing Testimony

Ms. Mathenia was forty-five years of age at the time of the hearing before the ALJ and testified that she became disabled in March of 2000 (Tr. 1057) Ms. Mathenia testified that the several medicines she takes cause lethargy and contributed to her being fifty to sixty pounds overweight (Tr. 1057). She further testified that she lives with her spouse and son who take care of most all household chores (e.g. cooking, cleaning, etc.) (Tr. 1058). Ms. Mathenia claimed that she is limited to folding clothes and loading light dishes into the dishwasher (Tr. 1058-59). Tasks she used to perform and claims she no longer can complete include the following: maintain a large garden (Tr. 1059); drive a car in light of permanent neuropathy below the knee and a drop foot of the right leg post foot surgery on August 18, 2003 (Tr. 1060, 1080); use stairs (Tr. 1079); do needlework such as crocheting (Tr. 1080); break horses (Tr. 1097); go bowling (Tr. 1097); paint pictures (Tr. 1097) or engage in activities that require lifting (Tr. 1061).

Ms. Mathenia is a high school graduate and claims to have completed one year of college where she studied as a certified medical assistant (CMA) (Tr. 1061). She testified that she worked as a CMA for six years, a position that required heavy lifting approximately seventy-five percent of the time given the nature of close patient care involved (Tr. 1061). Ms. Mathenia claims that her subsequent jobs as a daycare provider, car salesperson, bartender, and waitress also entailed a heavy lifting component (Tr. 1062-66). She further testified that as an office helper with the Waterloo Community School District and telemarketer for AT&T, no lifting at all was required (Tr. 1065-66).

Ms. Mathenia claims that her job as a state babysitter for her grandson was the last gainful employment that she maintained until she could no longer lift the child (Tr. 1067).

She applied for other jobs, but claims that no one would hire her because of all of her health problems, i.e., heart condition, etc. (Tr. 283). Ms. Mathenia testified that her physical limitations include: arthritis of the knees, hips, and spine, neuropathy in the right leg,[1] two MIs[2] and continued angina pain, fibromyalgia, asthma,[3] as well as lung,[4] eye,[5] and bladder problems[6] (Tr. 1075). She also testified that she is allergic to grass, trees, pollen, some flowers, animal dander, dust, and dust mites (Tr. 1074). Ms. Mathenia claimed that she could no longer perform the work she did in her previous jobs (Tr. 1075).

She claimed that she can only stand for short intervals of five to ten minutes, uses the aid of a walker, cannot lift items exceeding five pounds without severe pain and must

[1] Ms. Mathenia testified that she underwent surgery for a broken foot that "created permanent neuropathy and drop foot" for which she now must wear a brace (Tr. 1060, 1068-69). She further claimed that she has no feeling from the knee down in her right leg as a result and requires the assistance of a walker to move around (Tr. 1069). She testified that since her ankle surgery, "I'm wobbly and I have no control over that foot so it just gives out, and I fall." (Tr. 1077).

[2] Ms. Mathenia testified that she experienced "several heart attacks in the last two years" and has to have her blood drawn once per month to monitor cholesterol and coronary risk factor (Tr. 1070).

[3] Ms. Mathenia claimed that environmental allergies precipitate asthma attacks where she cannot breathe and begins to hyperventilate (Tr. 1074). She further testified that neither the inhalation of smoke nor fumes bothers her asthma (Tr. 1074).

[4] Ms. Mathenia testified that she undergoes a CT Scan to monitor the status of a black spot in her lung every three months (Tr. 1073).

[5] Ms. Mathenia claimed that she suffers from the beginnings of pigmentation glaucoma for which she is on trials for contact lenses (Tr. 1074-75).

[6] Ms. Mathenia claimed that her "bad heart attack" caused her bladder to malfunction so that, post-surgery, she "just leak[s] all the time." (Tr. 1072). She further stated that she has no control over her bladder and must wear a diaper daily (Tr. 1070, 1072).

do so using her right arm (Tr. 1076-77). Ms. Mathenia testified that she cannot lift her left arm above shoulder-height due to a torn rotator cuff (Tr. 1082). She further testified that she can only sit for a couple of hours before she must lay down for approximately one-half hour and apply heat/ice packs to her affected hips and back (Tr. 1078). Ms. Mathenia claimed that she cannot stoop, squat, climb, or kneel (Tr. 1078-79). She stated that heat, humidity, and cold worsen her existing physical symptoms (Tr. 1081). She claimed that weather over 80 degrees precipitates increased blood pressure and heart rate, humidity complicates arthritis, and the cold induces joint stiffness (Tr. 1081).

Ms. Mathenia also testified that in addition to physically debilitating conditions, she suffers from several psychiatric illnesses that stem largely from the sudden death of her grandson while in her arms and being raped when eight years old (Tr. 1083-84). She admitted that these mental problems include post-traumatic stress, bi-polar disorder, a split personality, and severe anxiety (Tr. 1083-85). Ms. Mathenia claimed that she exhibits associated physical symptoms including, but not limited to, palpitations, shortness of breath, skin rashes, sleeplessness, and panic attacks (Tr. 1086-87). Ms. Mathenia further claimed that she suffers from sleep apnea and sometimes hears voices calling her "baby killer" or "murderer" when in public (Tr. 1087). She testified that her mental problems and many coinciding prescription medications impede her ability to perform work-related activities (Tr. 1086).

She claimed to have been hospitalized in the past for having suicidal tendencies and a loss of friends due to problems with social isolation (Tr. 1088). Ms. Mathenia testified that she seldom leaves unless accompanied by a relative or friend (Tr. 1098). She claims that stressful situations make her worried and Maggie, her alternate personality, then takes over (Tr. 1090). She admitted that she took an additional Seroquel and Xanax the morning of the hearing in anticipation of a highly stressful experience (Tr. 1086). She testified that she must approach work tasks at a very slow pace, becomes easily distracted, and is forgetful so that others must constantly remind her of scheduled activities (Tr. 1091).

Ms. Mathenia also testified that the host of medications she was taking at the time of the hearing contributed to her lethargy, disorientation, confusion, and tendency to sleep excessively during the day (Tr. 1095-96). She claimed that her daily medications included: Prevacid for stomach ulcers; Celebrex for arthritis; Flexeril as a muscle relaxant; Lisinopril and aspirin for the heart; Detrol for bladder control; Lipitor for cholesterol; Seroquel as an anti-psychotic; Inderal for migraines; Zoloft for depression; Xanax for anxiety; Ambien for sleep; Pulmacort for the lungs; and Allegra, Flonase, Albuterol, and Humibid for allergies (Tr. 1091-94).

She described a typical day as involving very little physical activity, spent mostly sleeping, watching television, or playing music (Tr. 1096-97). Ms. Mathenia testified that she must regularly visit different physicians and medical specialists which might interfere with mandated work hours (Tr. 1098-1101, 1009). She claimed to see her psychiatrist Dr. Targoff twice a month, a social worker bi-weekly, a physical therapist twice a week, a cardiologist every six weeks, a rheumatologist every three months, and a neurologist during the course of the year when her family care physician, Dr. Harter, desires a second opinion (Tr. 1098-1101).

When asked by the ALJ who told her that she had a second heart attack, Ms. Mathenia claimed that she did not know she just had angina at the time and believed herself that the pain stemmed from another heart attack (Tr. 1102). She further admitted that she under went a test for sleep apnea on October 25, 2002 resulting in CPAP nightly treatment (Tr. 1103). Ms. Mathenia testified that she continued to smoke (Tr. 1103).

### III.  CONCLUSIONS OF LAW

#### A.  Scope of Review

In order for the court to affirm the ALJ's findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole. See Lochner v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989). Substantial evidence is more than a mere scintilla. It means relevant evidence

a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1997); Cruse, 867 F.2d at 1184; Taylor v. Bowen, 805 F.2d 329, 331 (8th Cir. 1986). The court must take into account evidence that fairly detracts from the ALJ's findings. Cruse, 867 F.2d at 1184; Hall v. Bowen, 830 F.2d 906, 911 (8th Cir. 1987). Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Cruse, 867 F.2d at 1184 (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)). The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence. Gunnels v. Bowen, 867 F.2d 1121, 1124 (8th Cir. 1989); Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

B. ALJ's Disability Determination

Determining whether a claimant is disabled involves a five-step evaluation. See 20 C.F.R. § 404.1520(a)–(f); Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

> The five steps are:
> (1)    If the claimant is engaged in substantial gainful activity, disability benefits are denied.
>
> (2)    If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.
>
> (3)    If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.
>
> (4)    If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she

performed in the past. If the claimant is able to perform her previous work, she is not disabled.

(5) If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

Trenary v. Bowen, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990). (citing Yuckert, 482 U.S. at 140–42); 20 C.F.R. § 404.1520(a)–(f).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he [or she] is unable to perform his [or her] past relevant work." Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995) (citing Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience. Id.

Under the first step of the analysis, the ALJ found that Ms. Mathenia had not engaged in substantial gainful activity since her alleged onset date (Tr. 23). At the second step, the ALJ determined that the combination of Ms. Mathenia's physical and mental impairments constitutes severe impairments (Tr. 24). At the third step, the ALJ determined that Ms. Mathenia's impairments did not meet or equal one of the listed impairments (Tr. 24). At the fourth and fifth steps, the ALJ determined that Ms. Streight has the residual functional capacity to perform certain unskilled sedentary work and therefore was not disabled (Tr. 22).

## C. Credibility Determination

Ms. Mathenia claims that the ALJ failed to evaluate Ms. Mathenia's credibility according to the Polaski standard. See Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984). Ms. Mathenia argues that her subjective allegations of pain and fatigue are inconsistent

with the ability to perform competitive employment, and are consistent with both the medical records generally and with the opinion of Ms. Mathenia's treating physicians. According to Ms. Mathenia, the ALJ failed to identify inconsistencies in the record as a whole in discrediting her subjective complaints. Specifically, Ms. Mathenia contends that as a result of the combined effect of her impairments, i.e., osteoarthritis, fibromyalgia, anxiety, dissociative disorder, post-traumatic stress syndrome, environmental allergies, etc., she does not have the ability to perform competitive employment, and that inability is consistent both with the medical evidence and with the record as a whole.

The Commissioner counters that the ALJ properly evaluated Ms. Mathenia's credibility, and is consistent with the standard for evaluating pain and other subjective complaints set forth in Polaski. The Commissioner describes in detail Ms. Mathenia's medical record and alleged daily living restrictions, and argues that the accumulation of contradicted statements, unsupported allegations, and symptom exaggeration forms a sufficient basis upon which the ALJ could determine that Ms. Mathenia's claims of disabling pain and fatigue were not credible. Alternatively, the Commissioner argues that the ALJ adequately accounted for Ms. Mathenia's alleged fatigue in limiting her to sedentary work, which involves mostly sitting and very little light lifting.

In finding that Ms. Mathenia's credibility was eroded, the ALJ relied on a series of inconsistencies that collectively undermine Ms. Mathenia's allegations regarding the existence, persistence and intensity of her symptoms and functional limitations (Tr. 28-39). For example, Ms. Mathenia worked as a babysitter during the claimed period of disability for chronic pain where she supposedly had trouble lifting anything in excess of five pounds. She claimed at various times that prescribed medicines and treatment regimens (e.g., physical and psychological therapy) were effective to some degree in reducing symptoms and often reported no side effects of medications, but continues to assert that she suffers from a medicine-induced debilitating fatigue. In August of 2001, Ms. Mathenia attempted to obtain stronger pain killers from Dr. Palma after Dr. Harter had already

prescribed Lortabs the day before and refused to provide additional medications at that time. The following year, she requested percocet for a bruised hip after bumping into a table even though the x-ray was negative. The treating physician explained that Dr. Palma would have to provide such narcotics.

She has consistently offered conflicting statements with regard to her history and practice of smoking. On November 15, 2001, she claimed to "not smoke that much anymore," but the examining physician reported a definite tobacco odor emanating from the patient's clothes and breath (Tr. 29). Doctors have repeatedly advised Ms. Mathenia to quit smoking, particularly given the increased risks post-heart surgery. Although Ms. Mathenia does not allege uterine problems as one of the physical conditions on which she rests the current disability claim, Ms. Mathenia failed to provide an accurate health data history for the examining physician upon request. She was reported as being evasive and offering contradictory answers. Ms. Mathenia claimed to suffer from a torn rotator cuff and rheumatoid arthritis, but there exists no convincing medical evidence in the record to corroborate either condition.

Dr. Kettman's consultative physical exam of Ms. Mathenia in April of 2002 showed that she suffered "no atrophy or deformity" that would precipitate left handed weakness resulting in dropped items (Tr. 30). Ms. Mathenia alleged serious bladder problems including urinary incontinence although no medical record confirms any associated symptoms or diagnoses. Ms. Mathenia continues to complain of migraines even after successful pain control and treatment with medications was established. Upon examination, one doctor noted how Ms. Mathenia's treating physicians at times throughout the relevant medical period have commented on Ms. Mathenia's tendency to misrepresent personal information and/or give poor effort on physical exams.

On August 20, 2002, Ms. Mathenia visited the emergency room suffering from extreme weakness and fatigue after allegedly passing out in Dr. Harter's office. However, the triage nurse reported that Ms. Mathenia acted asleep and feigned unconsciousness

because she failed the hand-drop test. She even appeared wide awake and talkative at the ER check-in. Certain record facts indicate that Ms. Mathenia does not suffer any significant cardiac impairment post-surgery as she claims. Subsequent visits to the emergency room for alleged chest pains resulted in several heart-related tests (i.e., EKG, enzyme test, chest x-ray, etc.), all of which produced normal results. Ms. Mathenia alleged to have three MIs when the record evidence only supports one such episode. Ms. Mathenia's continued smoking is inconsistent with a severe heart-related debilitation or any breathing-related impairment (e.g., allergies and asthma). In July of 2002, Dr. Kabel noted in his report that Ms. Mathenia could work after having a myocardial infarction despite her request for an official letter stating otherwise. Although the evidence demonstrates that Ms. Mathenia had a spinal chord lesion consistent with multiple sclerosis, the record does not stipulate work limitations associated directly therewith.

The ALJ did not credit Ms. Mathenia's alleged excessive sleep symptoms given that "no side effect of any medication has been persuasively established which has lasted a 12-month continuous period despite attempts at adjustment or substitution." (Tr. 32). Although a sleep study was suggested by physicians and allegedly took place according to Ms. Mathenia, there is no record evidence of such a study. Ms. Mathenia failed to mention the results of any sleep apnea test or the use of any related aid devices (i.e., CPAP mask) during a later neurolgical exam.

Regarding her mental health, consultative psychological exams reported that Ms. Mathenia's "affect was normal except when discussing the deaths" of her grandchildren and that she "could perform at least part-time low skill duties." (Tr. 34). Of her many mental diagnoses, only anxiety and depression pursuant to the children's deaths are well supported by the record evidence. The ALJ also observed that Ms. Mathenia's alert demeanor at the hearing contradicted claims of tiredness and extreme mental distress. Ms. Mathenia's alleged inability to tolerate cold temperatures also seemed at odds with her wearing a short sleeve shirt in a cold courtroom without complaining

about her arthritis.  The ALJ noted how the record offers no evidence that Ms. Mathenia suffers from a somatoform type disorder that might explain her need to exaggerate personal information and functional capabilities.

When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard them "solely because the objective medical evidence does not fully support them." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  "The [ALJ] is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations.  Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." Id.  In evaluating claimant's subjective impairment, the following factors are considered:  (1) the applicant's daily activities; (2) the duration, frequency and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.  Id. at 1321-22.

However, subjective complaints may be discounted if inconsistencies exist in the evidence as a whole.  Hinchey v. Shalala, 29 F.3d 428, 432 (8th Cir. 1994); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  Where an ALJ seriously considers but for good reasons explicitly discredits a plaintiff's subjective complaints, the court will not disturb the ALJ's credibility determination.  Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  Additionally, an ALJ is permitted to factor in the claimant's demeanor upon personal observation as part of complete credibility assessment.  See Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir. 2001).

The court finds ample inconsistencies in the record as a whole to support the ALJ's credibility determination.  Although Ms. Mathenia claims in her personal pain/fatigue questionnaires that she suffers from serious mental and physical symptoms, the record evidence often contradicts the nature and scope of conditions suffered during the relevant review period. While Ms. Mathenia's medical records do mention some fatigue and increased tiredness, the records as a whole do not demonstrate that Ms. Mathenia was complaining of disabling fatigue to her treating physicians, as she is now in her claim for

benefits. The ALJ's credibility determination is supported by substantial evidence on the record as a whole and will not be disturbed. See Jenkins v. Brown, 861 F.2d 1083, 1086 (noting that exaggeration of symptoms is a factor to be weighed in evaluating subjective complaints of pain); Gulliams v. Barnhart, 393 F.3d 798, 800 (8th Cir. 2005 (concluding that the ALJ's determination that plaintiff's complaints of pain were exaggerated was supported by substantial evidence).

### D. Treating/Examining Physicians

Ms. Mathenia argues that the ALJ improperly discounted the opinions of her treating physicians, Drs. Palma, Harter, and Targoff, which are consistent with Ms. Mathenia's subjective allegations of pain and fatigue. Ms. Mathenia contends that her treating physicians' opinions are only part of a larger record that fully supports her opinions that Ms. Mathenia is not capable of full-time, competitive employment. The Commissioner counters that the ALJ gave valid, legally sufficient reasons for his treatment of the physicians' opinions, i.e., that they were internally inconsistent and unfounded in the context of the record as a whole.

The ALJ gave little weight to Dr. Palma's single paragraph letter of July 18, 2002 opining that Ms. Mathenia was unable to work due to her medical conditions. The letter was conclusory and the ALJ found no indication that Dr. Palma was apprised at that time of important inconsistent record evidence, namely Ms. Mathenia's tendency to exaggerate the intensity of her symptoms and functional limitations.

The ALJ gave little weight to Dr. Targoff's completed mental health form questionnaire that labeled Ms. Mathenia as extremely limited in most work related activities. Dr. Targoff's assessment of July 7, 2004 was presented in a checklist manner without reference to medical evidence and was completed over one year after Ms. Mathenia's last insured date of December 31, 2003. The ALJ found that Dr. Targoff's treatment records from the relevant insurance period failed to support the suggested degree of limitation. The ALJ further found that his personal observations of

Ms. Mathenia's demeanor at the hearing failed to support the degree of limitation suggested by Ms. Mathenia. The timing here weighs in as a significant factor. The severity of Ms. Mathenia's mental conditions may have increased substantially between the date last insured in 2003 and and the 2004 date on which Dr. Targoff performed his final assessment before the hearing. Ms. Mathenia points to case law (e.g., Luna v. Bowen, 834 F.2d 161, 162 (10th Cir. 1987)) to demonstrate that psychiatric findings are supported by objective evidence, which may include both physiological and psychological indicia. However, in this case, Dr. Targoff's psychological assessment occurred outside of the relevant period and therefore is properly accorded little weight.

Dr. Harter opined that Ms. Mathenia could not lift or carry items in excess of five to ten pounds, stand/walk for protracted time periods, or stoop, kneel, climb, and crawl. Still, Dr. Harter determined that Ms. Mathenia could tolerate sitting and handling, thereby retaining a measure of functional capability. The ALJ ultimately found Dr. Harter's opinion to understate Ms. Mathenia's actual capabilites given that Dr. Harter remained unaware of record inconsistencies and the tendency for Ms. Mathenia to exaggerate physical symptoms.

The ALJ also rejected the opinions of various consultative examining physicians. Dr. Kettman reiterated Ms. Mathenia's subjective complaints in his opinion and made findings inconsistent with those complaints. Ms. Mathenia claimed to suffer from rheumatoid arthritis, but displayed no physical symptoms associated therewith and was not on routine medications for that condition. There was also no medical evidence in the record to support such a diagnosis. Ms. Mathenia alleged weakness in her left hand such that she was prone to dropping items but, upon physical examination, Ms. Mathenia displayed a normal hand grip. This issue of grip also presents a matter of contention because Dr. Harter reported earlier that she could tolerate handling. Dr. Kettman further noted that Ms. Mathenia made a poor effort on the exam.

With regard to Dr. Scott's opinion on the psychological status of Ms. Mathenia, the ALJ did not expressly disregard the assessment. The ALJ considered and weighed the mental capacity to function in a competitive work environment for Ms. Mathenia as suggested by Dr. Scott, but determined that other indicators in the opinion were less credible given the inconsistencies of the record as a whole.

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted). The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. See 20 C.F.R. § 404.1527(d)(2). Whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight. Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). The ALJ may discredit a physician's opinion based entirely on the subjective complaints of a claimant in the absence of objective medical evidence. See Woolf v. Shalala, 3 F.3d 1210, 1214 (8th Cir. 1993). Furthermore, the 8th Circuit has made it clear that "[w]hen an individual is no longer insured for Title II disability purposes, we will only consider an individual's medical condition as of the date she was last insured." Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997) (citing Bastian v. Schwiker, 712 F.2d 1278, 1280 (8th Cir. 1983)).

Moreover, a treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement. Piepgras v. Chater, 76 F.3d 223, 236 (8th Cir. 1996). See also Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991) (holding that

the weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements). Although medical opinions on the specific amount or hours of work a claimant can do are permitted and encouraged, treating physicians cannot opine as to whether a claimant can be gainfully employed. Smallwood v. Charter, 65 F.3d 87, 89 (8th Cir. 1995). Such conclusions are intended for the vocational expert as they exist "outside the medical province." Id.; See also Nelson v. Sullivan, 946 F.2d 1314, 1316 (8th Cir. 1991) (noting that physician statements concerning a claimant's potential for gainful employment do not constitute medical opinions, but opinions on the Social Security Act's application).

Ms. Mathenia established care with her treating physicians who offered her extremely limiting opinions of Ms. Mathenia's abilities. Dr. Palma provided a conclusory letter, Dr. Targoff an unsubstantiated questionnaire given outside the insured time period, and Dr. Harter an understated letter involving only Ms. Mathenia's arthritic condition. The ALJ properly discounted the treating physicians' opinions, as explained and set forth in his findings. They were not supported by the medical records, inconsistent, and generally exaggerated.

Ms. Mathenia also challenged the ALJ's acceptance of the proffered state agency physician opinions as substantial evidence because they only reviewed available records and did not examine Ms. Mathenia herself.

The ALJ has the right to consider opinions of state agency medical consultants because they are not just physicians, but also experts in the field of Social Security law. See 20 C.F.R. § 404.1527(f)(2). Furthermore, such opinions from state approved psychological and medical advisors may at times be accorded significant weight.

> In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources. For example, the opinion of a State agency medical or psychological consultant or other program physician or

psychologist may be entitled to greater weight than a treating source's medical opinion if the State agency medical or psychological consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.

SSR 96-6p.

Here, the ALJ accorded state agency opinions, like that of Dr. Koons, more weight than those of the treating or consulting physicians because Dr. Koons had the benefit of reviewing a complete medical file. Other physicians based their opinions on potentially skewed data that prevented identification of the inconsistencies evident upon full review of the records. Those doctors were not positioned to learn the extent of Ms. Mathenia's propensity for exaggerating symptoms and limitations.

### E. Full and Fair Evaluation of the Record

The plaintiff claims that she did not receive a full and fair evaluation of her record based on the ALJ's failure to set forth record inconsistencies to the treating physicians and seek clarification or additional evidence from them. Ms. Mathenia argues that the ALJ is required to contact a treating physician if the records offered are inconclusive or otherwise inadequate. See 20 C.F.R. § 4004.1512(e)(1). The Commissioner counters that the ALJ was under no obligation to re-contact treating physicians before discounting their opinions as unsubstantiated and/or inconsistent with the record. The Commissioner believes that Ms. Mathenia misconstrues the appropriate circumstances under which an ALJ must re-contact a treating physician.

The ALJ is duty bound to "develop the record fairly and fully," Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004). "[E]vidence developed in an administrative hearing must be fully and impartially evaluated and resolved to meet the ends of justice, not molded to fit the predisposition of the factfinder." Cline v. Sullivan, 939 F.2d 560, 569 (8th Cir. 1991). In so doing, ALJs and other similar quasi-judicial administrative officers are presumed to be unbiased. Schweiker v. McClure, 456 U.S. 188, 195 (1982); Isom v.

Schweiker, 711 F.2d 88, 90 (8th Cir. 1983) (citing Withrow v. Larkin, 421 U.S. 35, 57 (1975)). In a social security disability hearing, the ALJ "is not required 'to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.'" Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005) (quoting Stormo v. Barnhart, 377 F.3d 801, 805 (8th Cir. 2004)). Inadequate, unclear, and incomplete medical evidence or the use of unacceptable laboratory/clinical techniques would create such an undeveloped issue crucial to a complete evaluation. Id. (citing 20 C.F.R. §§ 404.1512(e), 416.912(e)). An ALJ may disregard a physician's opinion without seeking clarification when such opinions are merely "inconsistent with other substantial evidence." Id.

The ALJ did not disregard the opinions of various treating physicians because of unclear, incomplete, or unacceptable medical records and tests. Rather, the ALJ discounted those opinions that were not substantiated with record evidence on the whole. Neither the Commissioner's regulations nor applicable case law require a duty of the ALJ to re-contact physicians for further review under such circumstances.

F. Incomplete RFC and Hypothetical

Ms. Mathenia argues that the hypothetical relied upon by the ALJ in determining that Ms. Mathenia could return to the workforce was improper because it relied on an incomplete RFC that failed to completely describe Ms. Mathenia's impairments. Ms. Mathenia contends that the ALJ ignored medical evidence of disability by failing to include Ms. Mathenia's subjective complaints of pain/fatigue without setting forth specific reasons for doing so. Because the resultant hypothetical question posed by the ALJ does not relate all of Ms. Mathenia's impairments, Ms. Mathenia further argues that any testimony elicited therefrom cannot constitute substantial evidence. As such, Ms. Mathenia contends that this matter should be reversed and possibly remanded for further proceedings. The Commissioner counters that the ALJ's limitations regarding Ms. Mathenia's abilities were based on a documented history of exaggeration that impacted the credibility of subjective complaints, which is entirely proper.

An improper hypothetical cannot serve as substantial evidence. Whitmore v. Bowen, 785 F.2d 262, 263-64 (8th Cir. 1986). The hypothetical should precisely describe the claimant's impairments in order for the expert to properly evaluate the availability of jobs the claimant can perform. Newton v. Chater, 92 F.3d 688, 694-95 (8th Cir. 1996). "If a hypothetical question does not include all of the claimant's impairments, limitations, and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability." Baker v. Apfel, 159 F.3d 1140, 1144 (8th Cir. 1998). "Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). However, the question need only include impairments supported by substantial evidence and not impairments rejected by the ALJ as untrue. See Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997).

As set forth above, the ALJ's hypothetical question properly included only those physical and mental impairments which were supported by substantial evidence. The ALJ is not required to reiterate the several record inconsistencies that resulted in a determination of reduced credibility concerning Ms. Mathenia's subjective complaints of pain and fatigue. The ALJ did not look to a single inconsistency but relied instead on the many contradictions in the record to collectively act as an inconsistency so significant as to negate subjective allegations of pain and fatigue. See Bowman v. Barnhart, 310 F.3d 1080, 1084 n.3 (8th Cir. 2002). Even though the combination of prescription medicines (e.g., anti-depressants, anti-psychotics, sleeping pills, etc.) that Ms. Mathenia takes daily may cause drowsiness and despite the fact that the ALJ may have failed to fully develop the evidence regarding the potential medicine side effects of fatigue on Ms. Mathenia, there remains substantial evidence that supports the ALJ's decision to disregard subjective complaints. While the court must consider "evidence that detracts from the Commissioner's decision as well as evidence that supports the decision," a reversal will

not be granted simply "'because substantial evidence exists for the opposite direction.'" Long, 108 F.3d at 187 (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)).

Although mental impairments including anxiety and depression were not explicitly mentioned in the RFC as limitations per se, the ALJ did account for the associated effects as supported by substantial medical evidence. Specifically, the ALJ determined that Ms. Mathenia be limited to an uncrowded, non-stress inducing work environment that involved simple, repetitive tasks, limited social interaction with others, and guaranteed the absence of children. The ALJ did not need to consider the hypothetical questions posed by Ms. Mathenia's attorney that reflected severe mental impairments because the symptoms associated therewith stem from alleged subjective complaints already found to lack credibility.

The ALJ did agree that Ms. Mathenia could not perform the work she did in the past. One of the ALJ's RFC restrictions, that Ms. Mathenia cannot lift above shoulder level more than 20 pounds on occasion and 10 pounds with frequency, does appear to lack record support. Regardless, even had the ALJ limited Ms. Mathenia to lifting no more than 5 to 10 pounds occasionally or nothing at all, that would not preclude the performance of those sedentary jobs cited by the vocational expert and relied on by the ALJ in finding Ms. Mathenia to not be disabled. In response to the ALJ's third hypothetical, the vocational expert opined that an inability to "sit more than two hours total before needing to lie down for 20 to 30 minutes" would preclude the three suggested sedentary jobs (e.g., addresser, weight tester, and document preparer) available in the national economy (Tr. 1108). The ALJ did not include such restrictions in the RFC because they stem from exaggerated fatigue symptoms uncorroborated by substantial medical evidence that he formerly rejected. The ALJ's decision to reject such impairments will not be reversed.

Upon the foregoing.

IT IS ORDERED that the determination of the ALJ is affirmed.

June 21, 2006.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT